## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| ZAKEYA STARKS, | : | Case No. 1:22-cv-382 |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| K.E.L.L.Y. YOUTH SERVICES INC., | : | |
| Defendant. | : | |

### ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 18) AND REMANDING COUNT VI TO STATE COURT, THEREBY TERMINATING THIS CASE IN THIS COURT

This civil case is before the Court on Defendant's motion for summary judgment (Doc. 18) and the parties' responsive memoranda (Docs. 23, 26).

## I. BACKGROUND

**A. K.E.L.L.Y. Youth Services, Inc. ("KYS")**

KYS is a nonprofit corporation that operates group homes in Hamilton County, Ohio. (Doc. 18-1 at ¶ 1; Doc. 22 at ¶ 1). KYS offers 24-hour, private non-custodial group homes, semi-independent living programs, and independent living programs that foster and empower living and learning for youths aged 9 to 21 years old. (Doc. 18-1 at ¶ 1; Doc. 22 at ¶ 1).

KYS maintains certain employment policies. KYS's Job Abandonment Policy provides that when an employee fails to show up to work or call in with an acceptable reason for the absence for a period of three consecutive days, the employee will be

considered to have abandoned his or her job. (Doc. 18-1 at ¶ 2; Doc. 22 at ¶ 2). KYS's Attendance Policy advises that employees may be required to provide documentation of any medical or other excuse for being absent or late when permitted by applicable law. (Doc. 18-1 at ¶ 3; Doc. 22 at ¶ 3). KYS's Sick Pay Policy reads that employees may also be requested to provide certification of illness to your Facility Manager. (Doc. 18-1 at ¶ 4; Doc. 22 at ¶ 4).

### B. Starks' Employment with KYS

Plaintiff Zakeya Starks was employed by KYS as an Assistant Group Home Manager from May 19 to July 15, 2020. (Doc. 18-1 at ¶ 6; Doc. 22 at ¶ 6). When Starks became employed by KYS, she acknowledged, understood, and agreed to abide by KYS's Job Abandonment, Attendance, and Sick Pay policies. (Doc. 18-1 at ¶ 5; Doc. 22 at ¶ 5).

Starks worked on-site at KYS's Hartwell House from June 1 to June 8, 2020.[1] (Doc. 18-1 at ¶ 7; Doc. 22 at ¶ 7). Around June 9, Starks informed Carla Howard, former KYS Client Support/HR Manager, that she was not feeling well and that she had taken a COVID-19 test. (Doc. 18-1 at ¶ 8; Doc. 22 at ¶ 8). On June 12, Starks had her medical provider fax her June 9, positive COVID-19 test to KYS, which test results stated that Starks required a 14-day incubation period, expiring on June 23. (Doc. 18-1 at ¶ 9; Doc. 22 at ¶ 9). Starks' initial symptoms included loss of taste and smell, a fever, body aches

---

[1] Unless otherwise noted, all factual dates in this Order refer to the year 2020.

and chills, headache, coughing, and trouble sleeping, which lasted for the first week of her illness. (Doc. 18-1 at ¶ 10; Doc. 22 at ¶ 10).

Starks did not return to work on June 23. (Doc. 18-1 at ¶ 12; Doc. 22 at ¶ 12). On June 25, Starks informed Howard that she had been re-tested for COVID-19 and that her results were positive again. (Doc. 18-1 at ¶ 13; Doc. 22 at ¶ 13). In response, Howard asked Starks to provide a copy of her second positive test results. (*Id.*)

On June 30, Starks exchanged multiple emails and text messages with Howard and Tiffany Kelly, the administrator of KYS. (Docs. 19-6, 19-8, 23-4, 23-6). As part of those messages, Starks emailed her June 25 results to Howard. (Doc. 18-1 at ¶ 14; Doc. 22 at ¶ 14). The positive test results were from Community Health Centers of Cincinnati and Hamilton County, and stated the following:

> The CDC currently recommends that you should stay home and do not go out unless you need to seek medical care. You should continue to self-isolate until three things have happened:
>
> 1. You have had no fever for at least 72 hours (this is three full days of no fever without the use of medicine that reduces fevers)
>
> AND
>
> 2. Other symptoms have improved (for example, when your cough or shortness of breath has improved)
>
> AND
>
> 3. At least 10 days have passed since your symptoms first appeared. Your symptoms first appeared on: _____.

(Doc. 23-5).

3

KYS <u>understood</u> the statement contained in Starks' test results as guidance that Starks could return to work once those conditions had been meet, *i.e.*, regardless of a positive test, Starks could return to work if she had no fever for 72 hours, her other symptoms had improved, and 10 days had passed since her symptoms first appeared. (Doc. 18-1 at ¶ 15; Doc. 22 at ¶ 15). Thus, in response to the test results, Howard and Kelly inquired about Starks' fever, symptoms, and date of first symptoms. (Doc. 18-1 at ¶ 17; Doc. 22 at ¶ 17; *see e.g.*, Doc. 19-6 at 1, 3, 6; Doc. 19-8 at 1).

Starks stated that she did not know when her symptoms first appeared. (Doc. 18-1 at ¶ 18; Doc. 22 at ¶ 18). Starks also wrote that she was not having any symptoms other than back pain, but the back pain may not be related to COVID-19. (Doc. 18-1 at ¶ 19; Doc. 22 at ¶ 19).

During those exchanges, Starks texted Kelly the following:

> Seems to me you all feel comfortable with me returning to your business knowing that I am positive. Yes I am not having any symptoms other than back pain which was my first symptom of it all but could just be regular back pain. But once again I have not been cleared to return and this has come from urgent care so if there is something you all need to do with position, that's fine but my health comes first sorry.

(Doc. 19-8 at 2).

Starks testified she was mostly asymptomatic by June 26, and that she tested negative for COVID-19 on July 1. (Doc. 18-1 at ¶ 22; Doc. 22 at ¶ 22).

Starks and KYS did not communicate with each other between July 1 and July 15, nor is there any evidence in the record reflecting any communications between the parties at that time. (Doc. 18-1 at ¶¶ 23-25, 30; Doc. 22 at ¶¶ 23-25, 30). Starks never contacted

4

KYS to discuss her termination, raise any complaints of discrimination, or request an accommodation. (Doc. 18-1 at ¶ 33; Doc. 22 at ¶ 33). Kelly claimed that, because she did not hear anything from Starks during that time, she concluded Starks abandoned her job and terminated her employment, effective July 15. (Doc. 18-1 at ¶¶ 31-32; Doc. 23-7; Doc. 23-8).

For the June 1 through June 15 pay period, KYS paid Starks her regular rate for 43.6 hours of work and 36.4 hours at her regular rate for sick pay. (Doc. 18-1 at ¶ 27; Doc. 22 at ¶ 27). For the pay period from June 16 through June 30, KYS paid Starks for 43.6 hours at her regular rate for sick pay. (Doc. 18-1 at ¶ 28; Doc. 22 at ¶ 28). In total, KYS paid Starks a total of 80 hours at her regular rate for sick leave. (Doc. 18-1 at ¶ 29; Doc. 22 at ¶ 29).

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

#### A. Counts I through IV

In Counts I through IV, Starks' asserts claims for disability discrimination and failure to accommodate under federal and state law. (Doc. 11 at ¶¶ 58-150). KYS moves for summary judgment on these claims. (Doc. 18 at 7-14). Starks did not respond to KYS's arguments, instead merely noting that she "voluntarily dismisses the remaining Counts, I. II, III, [and] IV." (Doc. 23 at 18, n.77). Accordingly, KYS is entitled to summary judgment with respect to Counts I, II, III, and IV. *See, e.g.*, *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

#### B. Count V: Unlawful Interference with FFCRA Rights

In Count V, Starks asserts an "unlawful interference with FFCRA rights" claim. (Doc. 11 at ¶¶ 151-164).

On March 18, 2020, Congress enacted the Families First Coronavirus Response Act ("FFCRA") in response to the emergent COVID-19 pandemic. *See* Pub. L. No. 116-127, 134 Stat. 178 (2020). Two major provisions of the FFCRA were the Emergency Family and Medical Leave Expansion Act ("EMFLEA"), which temporarily amended Title 1 of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and

6

the Emergency Paid Sick Leave Act ("EPSLA"), which was enforced through the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*.

### 1. *EFMLEA*

Starks' claim, as alleged, did not cite a specific provision that the FFCRA that KYS violated. (Doc. 11 at ¶¶ 151-164). However, in her response in opposition, Starks analyzed her claim as an EMFLEA/FMLA retaliation claim. (Doc. 23 at 15-17). Accordingly, the Court considers Starks' claim as a EMFLEA retaliation claim.

"The EFMLEA temporarily amended the FMLA to entitle certain employees to twelve weeks of leave per year 'because of a qualifying need related to a public health emergency.'" *Clement v. Surgical Clinic, PLLC*, 623 F. Supp. 3d 835, 850 (M.D. Tenn. 2022), *aff'd*, No. 22-5801, 2023 WL 3035231 (6th Cir. Apr. 21, 2023) (quoting 29 U.S.C § 2612(a)(1)(F)). "A qualifying need includes if 'the employee is unable to work (or telework) due to a need for leave to care for [a] son or daughter under the age of 18 years of age of such employee if the school or place of care has been closed, or the child care provider of such son or daughter is unavailable, due to a public health emergency.'" *Id.* (quoting 29 U.S.C. § 2620(a)(2)(A)) (alternation in original).

"Whether for interference or retaliation, claims under the EFMLEA that, like those in this case, depend on circumstantial evidence are subject to the familiar McDonnell Douglas burden-shifting framework." *Id.* at 851. Under this framework, the plaintiff must first establish a prima facie claim of interference or retaliation. If the plaintiff establishes a prima facie claim, the burden then shifts to the employer to provide a legitimate reason for the termination. If the defendant satisfies its burden, the plaintiff

must then put forth evidence to show that the employer's stated reason is pretextual. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (retaliation).

To state a prima facie case of EFMLEA retaliation, Starks must show that: (1) she engaged in a protected activity under the EMFLEA; (2) she notified KYS of her intent to take leave; (3) she suffered an adverse employment action; and (4) there was a causal connection between the exercise of her rights under the EMFLEA and the adverse employment action. *Id.*

Here, Starks fails to make a prima facie case because Starks fails to show that she was engaged in protected activity under the EMFLEA. Although Stark states that she was required to take leave because she tested positive for COVID-19 and needed to quarantine, there is nothing in the record to suggest that Starks took leave to care for a child because that child's care provider was unavailable due to the COVID-19 pandemic. 29 U.S.C. § 2620(a)(2)(A).

Accordingly, to the extent Starks asserted an EMFLEA retaliation claim, KYS is entitled to summary judgment on that claim.

### 2. EPSLA

In its opening motion, KYS analyzed Starks' FFCRA claim as one pursuant to the EPSLA/FLSA. (Doc. 18 at 14-15). As previously mentioned, in response, Starks analyzed her FFCRA claim under the EMFLEA/FMLA. (Doc. 23 at 15-17). Moreover, Starks did not respond to KYS's EPSLA arguments, so for that reason alone, any EPSLA claim may be deemed abandoned. *See Brown*, 545 F. App'x at 372. However, even had Starks attempted to assert a EPLSA claim, such claim fails as a matter of law.

8

"The EPSLA prohibits employers from retaliating against employees for taking sick leave due a qualifying COVID-19-related condition." *Wadley v. Nat'l Ry. Equip. Co.*, 572 F. Supp. 3d 361, 370 (W.D. Ky. 2021) (citing 29 U.S.C. §§ 5102 and 5110(2)). "Enforcement of EPSLA claims falls under the provisions of the [FLSA]." *Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *4 (6th Cir. June 1, 2023) (citing 29 U.S.C. § 5105(a)(1)). "And we use the McDonnell Douglas framework to evaluate FLSA claims involving indirect evidence of retaliation," such as this one. *Id.* (citing cases).

As already stated, Starks carries the initial burden of establishing a prima facie case of retaliation. If she establishes a prima facie case, the burden shifts to KYS to articulate some legitimate, nondiscriminatory reason for its actions. If KYS meets this burden, the burden shifts back to Starks to demonstrate that KYS's explanation was pretextual.

    a. <u>Plaintiff's Prima Facie Case</u>

First, a plaintiff bears the burden of establishing a prima facie case of retaliation. To establish a prima facie case of retaliation, an employee must show that: "(1) [she] was engaged in an activity protected by the [EPSLA];" (2) "the employer knew that [she] was exercising [her] rights under the [EPSLA];" (3) "after learning of the employee's exercise of [EPSLA] rights, the employer took an employment action adverse to [her];" and (4) "there was a causal connection between the protected [EPSLA] activity and the adverse employment action." *Wadley*, 572 F. Supp. 3d at 370 (quoting *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). Here, for purposes of resolving

9

Defendant's motion for summary judgment, the Court presumes that Plaintiff can establish her prima facie case.

### b. Defendant's Legitimate, Nondiscriminatory Reason

Next, the burden shift to KYS to proffer a legitimate, nondiscriminatory reason for its action. Here, KYS asserts that it terminated Starks because she abandoned her job when she stopped communicating with KYS on July 1 until her termination on July 15. Job abandonment is a legitimate, nondiscriminatory reason to terminate employment. *E.g., Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 843 (6th Cir. 2002).

### c. Pretext

Finally, the burden shifts back to the plaintiff to show that the defendant's reason was pretextual, *i.e.*, that the "'proffered reasons [for terminating her] were factually untrue.'" *Kovacevic*, 2023 WL 37576063, at *5 (quoting *Lindsay v. Yates*, 578 F.3d 407, 421, 422 (6th Cir. 2009) (alteration in original). Plaintiffs typically show pretext by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

Starks first suggests that KYS's reasoning was pretextual because the timing of her termination was suspicious. Specifically, Starks claims that she was terminated "before she could even return from leave due to COVID-10 and was disciplined and terminated approximately two weeks after her FFCRA leave ended." (Doc. 23 at 17).

10

"'[S]uspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence,'" but "'temporary proximity cannot be the sole basis for finding pretext.'" *Kovacevic*, 2023 WL 3756063, at *5 (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).

No reasonable juror would find the timing of Starks' termination suspicious. Starks admitted that she was mostly asymptomatic by June 26. Starks admitted that she tested negative for COVID-19 on July 1. Yet despite being asymptomatic and testing negative for COVID-19 by July 1, Starks did not return work. Nor did Starks make any attempt to inform KYS of her status. Indeed, Starks admitted that she had zero communication with KYS between July 1 and July 15.

Starks also argues that KYS's reasoning was pretextual because KYS terminated Starks on July 15, but Starks was not aware even a day later that she had been terminated. Specifically, on July 16, Starks texted Howard asking: "Who would I speak to about putting in my notice two week notice?," suggesting that Starks did not know about her termination. (Doc. 23-9). But *when* Starks received notice of her termination does create a genuine issue of fact on whether KYS's reasoning was pretextual. Moreover, if anything, Starks' text tends to support KYS's reasoning that Starks was, in fact, abandoning or quitting her job with KYS.

Finally, Starks argues KYS's reasoning was pretextual because KYS's CEO's deposition testimony conflicts with KYS's stated reasoning, *i.e.*, that she abandoned her job. Specifically, Starks claims that CEO Joseph Kelly testified "that she was terminated

11

in part because she submitted two-week notice of her resignation on July 16, 2020."

(Doc. 23 at 18).

> During his deposition, Joseph Kelly testified as follows:
>
>> Q: Do you know why [Starks] was ultimately terminated?
>>
>> A: I believe because she was not coming on any of the mandatory meetings, Zoom meetings, and she didn't—she stopped all contact with us for several weeks. I believe so.
>>
>> Q: So at some point there was a decision made where it was hey, Zakeya is not coming back, we have to—we're going to terminate her employment?
>>
>> A: That, along with her saying—sending us something about she is going to put in her two-week notice, something like that.
>>
>> Q: All right. And so who made that decision to officially terminate her employment?
>>
>> A: I don't recall exactly who did it, but—
>>
>> Q: Were you part of it?
>>
>> A: I could have been.

(Doc. 23-1 at 449).

No reasonable juror would conclude that Joseph Kelly's testimony concerning the two-week notice establishes pretext. Although Kelly testified (nearly three years after the termination) that Starks' termination may have been based, in part, on the notice, the document evidence from that time clarifies KYS's reasoning. Starks sent her two-week notice text on July 16. (Doc. 23-9). KYS mailed Starks her termination letter on July 13—three days <u>before</u> Starks inquired about putting in her notice. (Doc. 16-1 at ¶ 20;

12

Doc. 23-8). No reasonable juror could conclude that the text caused Starks' termination because KYS had already terminated Starks at that time.

In all, the undisputed evidence demonstrates that Starks first tested positive for COVID-19 on June 9, informed KYS, and took leave. On June 25, Starks tested positive again. On June 30, Starks sent her test results to KYS. Those test results recommended that she self-isolate until she was fever free for three days, her other symptoms had improved, and at least 10 days had passed since her symptoms began. KYS then asked for additional information about Starks' symptoms to see if she no longer needed to self-isolate (*i.e.*, could return to work). And although Starks was asymptomatic by that time, Starks refused to return to work or, alternatively, provide documentation stating she still could not return to work. **The <u>next</u> day, Starks tested negative**. But Starks did not tell KYS that she was negative. Starks did not tell KYS that she could return to work. Starks and KYS did not communicate for the next two weeks. So KYS made the decision to terminate Starks' employment, finding that she had abandoned her job.

Given these undisputed facts, no reasonable juror could conclude the KYS's decision to terminate Starks for job abandonment was pretextual. Accordingly, KYS is entitled to judgment as a matter of law on Count V.

**C. Wrongful Termination**

Finally, in Count VI, Plaintiffs asserts a claim from wrongful termination in violation of Ohio public policy. Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction. "When all federal claims

are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996).

Here, Starks' wrongful termination claim implicates Ohio public policy surrounding working conditions during the COVID-19 pandemic. Accordingly, with discretion, the Court declines to exercise supplemental jurisdiction over this claim. *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (noting "the Supreme Court's general comity-related principle that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law").

### IV.     CONCLUSION

Based upon the foregoing, Defendant's motion for summary judgment (Doc. 18) is **GRANTED in part**. Defendant is **GRANTED** summary judgment on Counts I through V of the Amended Complaint (Doc. 11). The Court **DECLINES** to exercise supplemental jurisdiction over Count VI and **REMANDS** Count VI to the Hamilton County Court of Common Pleas. The Clerk shall enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Date: January 3, 2024                                                              *s/ Timothy S. Black*
                                                                                                Timothy S. Black
                                                                                                United States District Judge